Good morning, and may it please the Court, my name is Caroline Brown, representing Jessica Bax in her official capacity as Director of the Missouri Department of Social Services. Director Bax is appealing a District Court decision issuing sweeping, burdensome, and statewide injunctive relief in a non-class action case brought by three individuals in an advocacy group. We ask the Court to reverse the judgment below on three grounds, first, that none of the plaintiffs have standing, second, that even if they do have standing, the Court erroneously granted summary judgment in favor of the plaintiffs on the three claims presented, and that even if the Court was correct to find against defendant on one of these counts, the far-reaching universal injunction was improper. I'd like to start with standing. No plaintiff had standing in the District Court, and no plaintiff has standing in this Court, both because there is no actual concrete injury in fact, and even if there was an injury, the relief that plaintiffs seek is not to redress their own injuries, but those of third parties. Isn't that last point a question of the scope of the remedy under Trump v. CASA? In other words, it's not really, they have standing to seek injunctive relief, but they only have standing to seek injunctive relief for themselves. Correct. It is both a standing issue and a remedy issue. I'd like to start with the standing of Empower Missouri. In the complaint, the plaintiffs assert that Empower Missouri is an advocacy organization that was injured because it diverted its organizational resources to counteract defendant's policies. In its summary judgment, the plaintiffs made the same representation that Empower Missouri was injured because it had diverted its staff time from other priorities. At the hearing on summary judgment, the District Court repeatedly asked Plaintiffs' Counsel whether Empower Missouri provided services or support to the individual plaintiffs or to other staff applicants, and was told that it does not, that the injury was that they had diverted their resources from other advocacy priorities to issues involving Missouri's call center. The District Court held that Empower Missouri had standing because it had diverted resources, but the Supreme Court decision in the Alliance for Hippocratic Medicine makes crystal clear that an organization cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. Rather, there has to be some sort of direct interference with core business activities. And plaintiffs now point to all of the evidence that they had introduced as diversion of resources to now claim that that is recast as an interference with their core business activities. But it just does not fit in that box. By way of comparison, in the Havens case, which the District Court relied on and which the plaintiffs cite, an apartment complex that had provided false information to a housing counseling organization, the housing counseling organization was found to have standing because the information provided had impaired it in providing assistance to its clients. Another example is this Court's recent decision in Get Loud Arkansas v. Jester, in which an organization involved in voter registration activities was found to have standing to challenge a rule that required a wet signature for voter registration. And that is because one of its core business activities of that group was an online registration tool that used a digital signature, which would no longer be authorized. And Powell, Missouri, has pointed to no evidence or argument even that it has the same type of core business activities in providing services to individuals rather than the advocacy which it claimed at the District Court level. Suppose they counseled staff benefits, you know, that people would come in and they counseled them and said, here's how you do it, here are the things you say, here's how you fill out the application, here are the steps. Would that be different? I think that might be different. It really depends what kind of counseling was provided. If Empower Missouri had staff members who were trying to assist individuals through the call center or if they were publishing documents as to what the interview was required, the easiest, the best way to have an interview, what the alternatives were. Something that was a core business activity, but they have provided no evidence that that's the sort of work that they did. And in fact, when the District Court asked them, they said that is not our, that's not our model. We are an advocacy group. If it was their model, let's just suppose that they had standing. I think the remedial question becomes different, and I'll tell you why. Well, it wouldn't be limited to particular plaintiffs, right? It would be, it would, at least it would be an argument for a universal injunction if they help people statewide. Now we can debate that, but it does change the calculus as to the remedial question, depending on whether Empower America, or Empower Minnesota has standing. I think, I think that's right. That there is no evidence that it, that that is the type of work that they do, and they said that it was not the type of work that they do. So it, it really falls squarely within the Alliance for Hippocratic Medicine side of the ledger, in terms of the work that it was doing. And with Empower Missouri out of the picture, which might be the only hook to provide statewide relief, and again, it would depend on the facts that were presented, and there were none that would support that type of injunction. The case would only be justiciable if the individual, individual plaintiffs have standing, and they do not. Mary Holmes was provided an interview. She received her SNAP benefits, and to date, she's continuing to receive her SNAP benefits. But we have this, this problem, I think, for the, for the, that the voluntary cessation doctrine, which is, my understanding of the statutory scheme is you either have to 12 months or 24 months have to recertify. Well, you have to recertify, but either 24 months or 12 months when you have to do another interview, excuse me. And so, the fact of the matter is, is that these systemic problems are still present in the system, the SNAP benefit system in Missouri. They're going to face this same problem in 12 months or 24 months, or at least we can't rule it out, which is, it's a very heavy burden. It is a heavy burden. It's a less heavy burden when it involves the state as the defendant or a public entity as the defendant than a, than a private entity. But also the, the- I don't understand that. I thought we were into whether the recertification is required or not. So, that is a, that is a separate argument, your, your honor. And recertification is generally not, or, recertification is always required. Well, the record's terrible on that, so we need to-  But, but go, you're, go ahead. Okay. I'll, I'll get to your question in a moment, your honor. On, on the issue of, no, I've forgotten. Voluntary cessation.  Voluntary cessation. They're going to face, they're going to face an interview in 12 or 24 months. So, I think the paradigmatic case of voluntary cessation is not when the, is when a, when a policy is changed or a policy is withdrawn or there's some sort of representation made. Not a case where you've asked for an interview and you get, you ask for something and you get it. Now, this was a very fluid, dynamic situation in that the state knew that there was issues with the call center and it was continuously trying to adjust its processes and improve its, the way that it was handling the call center. The case arose right after the resource centers reopened after COVID and a lot of workers did not want to return to the, in office. So, there was a lot of moving pieces at the time. In that context, where it's a dynamic situation where the state is making a lot of change and is telling the court that it is making a lot of changes, I don't think it's really accurate that the, that the standard voluntary cessation metrics would, would apply. But in any- Is that a factual question though? Because I think the district court's point of view is you're not doing enough. This is just going to keep repeating itself even though these people got interviews. That, that, that was the district court's, that was the district court's view. We think that was erroneous, but that was the, the district court's view. On the question of whether an interview is required on recertification, recertification, so the, the certification, applicant, recipient is either certified for 12 months or for 24 months. For 24 months, that's if you are elderly or disabled. The Missouri also has a waiver that allows it, allows it to dispense with the interview, not with the recertification, but with the interview. For people who are elderly or disabled who have no other change in their household situation. So- How do we know that waiver exists? What's, what's the authority for it? So the, the, you know the waiver exists because it was referenced in the 30B6 deposition of the department's representative. They were questioned about it at oral, at summary judgment. So that's all we have. No. At summary judgment, the counsel for the state raised, told the court that one of the plaintiffs had recently been recertified and did not require an interview because of the waiver. Counsel said this to the court? Yes. And that's, that's evidence of record? That's on the, in the appellate record? Yeah, I wish you were clearer, your honor, but it is, it is, the counsel did raise it to the court that one of the plaintiffs had recently been recertified without an interview. That it was mentioned in the 30B6 deposition, and in the, on the relief stage, the court had asked that both parties to submit briefing as to what sort of relief it should consider and might be appropriate after summary judgment, and in the state's filings, it had also questioned whether some of the relief requested by the plaintiffs was necessary because it had this waiver. Is it, is that in a regulation or a statute or a policy book, or is it just sort of like at the whim of the director? So it is a, it's a, it's a waiver that is granted from the Food and Nutrition Service. But it's not written down anywhere. It, I, I believe there is a written document, but it is not in evidence. So that, that creates a problem for voluntary cessation, because if the waiver's not written down, it tends to be the case that we ignore it because they could change their mind any day. Like, basically, a new director could come in next week and say, yeah, this waiver thing, it doesn't comply with law, we're not doing that. That's, that's possible. It's built into the processes rather than the, rather than policy. So it is, if you look at the flow charts for how decisions are made as to whether or not an interview is required, it's baked into that. But is it a regulation that says from here on out we're going to have this waiver of an interview? It's not. Now, the plaintiffs were much more focused on capable of repetition yet evading review as to why they had standing. But the, but the district court focused on the voluntary cessation. But even if you said, okay, these three individual plaintiffs had standing because they might face the same situation in the future. Then the relief should be directed to those three plaintiffs, not system wide relief. But that's a remedy question. I mean, really, it's a remedy question. We don't normally put that, I understand your argument that it's standing. But that, that doesn't normally go in the standing box. It's about, because they would get, they could get injunctive relief as to themselves. It's just, they can't get it as to everyone else under, under the CASA case. Yes, and they weren't, they weren't, they were looking for it for themselves. But they were also looking for it for everybody else. And and so the, the redressability and the standing are really two sides of the same coin. Because it depends on the relief that you're seeking. And the relief that they were seeking was yes for themselves. And it would be easy enough to write something that says, okay, for these three plaintiffs, they need a special email or, or phone call so that they can get an interview, if they need one, without going through the call center. But the reason why I'm quibbling with you on that is because if you're right that it's standing, we have to raise it sua sponte. So even if nobody argues that it's universal, we have to raise that. And I don't think courts do that. I think courts allow, you may be, like the other side may be happy with the remedy. You may be happy with the remedy. And we don't care that it's a universal injunction. That's great. And so under your view, we'd have to raise that sua sponte and say, well, sorry guys. We gotta, both sides, we've gotta actually like narrow this injunction considerably. If it's jurisdictional. If it's jurisdictional. Yes. But I don't think that the court, that this court itself would narrow the, would narrow the, yeah. Or order the district. We'd have to raise it sua sponte is the real problem. Yes. So what if, what if we agree with you and we think it's a standing problem? What, okay. So if it's a standing problem, then I. What does that do with this appeal? Well, what would the, what would the decision of this court look like in your view? It would, it would resolve the appeal and would resolve the case below because the plaintiffs did not have standing. And the district court should have dismissed the complaint. Well, but some of the relief that was sought in the complaint is more narrow, right? And it is more tailored to these, to the individual plaintiffs view, conceding that it's not a class action. It's not a class action. If it were a class action, it would be a whole different territory. Isn't the first answer to the appeal is moot? If there's no standing? If no, if no plaintiff has standing, the appeal is moot. Yes. But regardless of, even if the case, even if there is standing and the case proceeds, we don't think, and we believe the district court was in error to find that there was a cause of action under the SNAP Act, that there was a constitutional due process violation, and that there was a violation of the ADA. But even if the court was right on that, the remedy was way too broad for what the court ordered. And if I could just circle back. No, I have to, we've skipped by a question I was about to ask. I thought it was accepted or a part of the record that Plaintiff Dallas got a recertification in 2013. Not in 2009, but in 2013. A recertification or an interview? I don't believe that there is anything in the record regarding Plaintiff Dallas requiring an interview. Well, if I'm right, if I'm right, and he did get that interview, isn't that powerful evidence that this waiver, this procedure you're talking about is, either doesn't exist or it gets enforced by anyone who feels like it. So I believe there's evidence that both Plaintiff Holmes and Plaintiff Davis required interviews because they were filing new applications. Yes, but then Davis got a second one. There was some confusion. There's a lot of confusion over the applications of Plaintiff Davis, because she filed two at the same time with a different social security number. So it's one change. So I think that, and they were overlapping, but I think she only had one interview. And I don't believe she's had one since then. Plaintiff- Well, I think she didn't get the interview, but she was required to be recertified. Everyone is required to be certified, recertified. The question is whether or not an interview is required on recertification. Everyone is required to be recertified. All right. Can I just ask a question about due process? Goldberg versus Kelly. The staff benefits is a different issue as to whether the staff act creates a private right of action. But it seems to me that Goldberg sort of already answers this question, where if you have a right to a public benefit, it benefits and it's arbitrarily denied, right? Then at least it seems to me that there's a genuine issue of material fact as to whether there's been a due process violation. So I think the more relevant case is this court's decision in Williams, where the plaintiffs were applying for public benefits and claimed that there was an arbitrary denial. And this court agreed that there was a property interest that implicated due process rights. But what they were seeking was a written notice of why it was rejected, a written notice that there was a right to appeal, and the documents that would allow them to pursue an appeal. All of that is provided through the fair hearing process in SNAP. You get a notice that says why you are denied. You get a notice that says you can appeal it. And that appeal takes place, the decision is rendered within 60 days of- The problem I think is, is they were asking for more. They're asking for additional things. And I understand that's all provided here. But the problem is, is an interview is also supposed to be provided here. And so their argument is different. They're saying, you are promising me something as an eligibility criteria that I simply am not getting. And so that's a due process violation, because my inability to get that is an arbitrary denial. And all of the plaintiffs could go, who were not able to get an interview. And without a doubt, there was a period when it was difficult to get through the call center if you did not answer the phone when the resource center, when the worker called you. But they all had the option to go to a resource center and get a face-to-face interview. So I think it's an error for constitutional purposes to focus only on one alternative, which is the telephone option, rather than going in person and requesting a face-to-face interview. Counsel, can I ask one more question?  Do you think that the complaint seeks relief that is, at least in part, that is more tailored to the situation of these individual plaintiffs? Or do you think the complaint solely is seeking a total overhaul? Both. I think there's one, my recollection is there's one sub-part of the remedial relief that is sought, that an interview be provided to two of the plaintiffs. And that the rest of the relief sought was a systemic overhaul. Now, you thought I was asking about Plaintiff Davis. I was asking about Plaintiff Dallas with the epilepsy. Yes, Your Honor. And if you could point me to... In January 2023, DSS mailed him recertification paperwork that needed to be completed within a month or benefits would end. That is correct. That is a federal requirement that everybody has to be recertified. But not everybody has to be interviewed upon recertification. But if he was within the exception... Even if he was in the exception, he would still have to refile the recertification papers. And that's the federal rule. That's not a state requirement. I'm over my time. I hope you'll indulge me for some on rebuttal. Thank you very much. Thank you. Ms. Diebler-Mills? Yes, thank you. Good morning. I'm Katherine Diebler-Mills for the appellees. I'd like to begin by clarifying some of the factual issues that just came up in Appellant's argument. As an initial issue, the matter that Judge Loken, you were just discussing with opposing counsel, in regards to Plaintiff Dallas' experience trying to keep his SNAP benefits when he was joining this litigation, he did have to recertify in 2023, but the record also shows that he interviewed. He was only able to get that interview after joining the litigation and getting access to the accommodations that he needed. But he was required to interview. So how does that play into this waiver question? Sure. So I think it's helpful to just like as an initial matter on this point. Well, do you agree that there is a waiver principle or procedure? So what is in the record as to this waiver is that an elderly... Do plaintiffs agree with that? I agree that there is... As a representation on appeal. There is a waiver. There is a waiver. There is an elderly and disabled waiver. That's in the record. It was in a 30 v. 6 deposition transcript. I have no reason to doubt that testimony. But all that's in the record as to this waiver is that a waiver exists and some information about some training procedures and some written updates that the agency does around the waiver. The evidence in the record does not include the waiver itself, what is actually written down. The terms of the waiver. The specific people that the waiver applies to. Or defendant's processes for applying the waiver. We also have, as I just noted, evidence in the record that Plaintiff Dallas, despite under defendant's representation falling within that waiver, still had to interview in 2023 to maintain his SNAP benefits. So defendant had... Well, does that mean they're acknowledging that they don't bother to enforce the waiver or what? I don't. I can't say based on the record. Well, I mean, I think you have the burden of proof on standing. And if this waiver procedure eliminates the threat of future personal injury to Dallas, just like the other two, I think the appeals move. The waiver does not eliminate the threat. Again, based on what we have in the record, based on what we have before us, there's no way to determine that the waiver does eliminate their harm. And because... Why not? Well, because... What's the harm? The harm, so... The Federal law requires submitting the paperwork, I was told.  So the Federal law requires submitting the recertification paperwork at regular intervals, as has already been discussed. The default under Federal law is that everyone has to interview. Every single applicant and every single person doing a recertification has to interview. The only way that you don't have to interview with your recertification is if there is some specific waiver that applies to you and that the agency has applied to you. So the default is... And where do you get that? Hmm? Where do you get that? What Federal... When has the Supreme Court said that? Oh, it's... This is the Federal regulations as to interview procedures, which I'm sorry, I don't have the sites for those in front of me, but they lay out that this is the default, that everybody is expected to interview. And then states can seek permission from the Federal government to waive those interviews as to specific populations, and then it is on the state to apply those waivers. There is no evidence in the record as to what the details of this elderly and disabled waiver are, or how a defendant applies them. And again, we... I don't see how this translates into the possibility of future injury to Dallas or any of the others. Well, because without knowing whether this waiver... knowing affirmatively whether this waiver applies to these plaintiffs and whether, if it does, it will be applied to them properly, they fall into that default bucket where they have to interview. The only way they don't interview is if this waiver both includes them and it's applied to them properly. Why is that an injury? Why is your... Why is the defendant responsible for that injury caused by Federal law? Oh, they're not responsible for an injury caused by Federal law. The issue here is... So the issue as to plaintiff's mootness is... The plaintiffs have argued that their claims are not moot due to voluntary cessation, that defendant gave them a one-time interview, but because there are ongoing systemic failures that are going to harm them again as they work to maintain their SNAP eligibility, that they will suffer that harm over and over again. They are not moot. And the same harm is, again? Oh, being deprived, being... As to Plaintiff Holmes and Plaintiff Davis... Say that again. As to Plaintiff Holmes and Plaintiff Davis, that harm is losing their SNAP benefits on a wrongful denial, being wrongfully denied for failure to interview. Okay, but what about Dallas? As for Mr. Dallas, he only stands for the ADA claim in this case. I brought him up in the context of this waiver because he's an example in the record of somebody who had to interview, but his issue is that he did not receive accommodations under the ADA, and for him, the accommodation he needs is to have SNAP paperwork explained to him. His epilepsy causes him to have trouble understanding written paperwork, and he'll need that every single time that he has to interact with the agency to continue to have his SNAP benefits. And he gets that from the federal regs? I'm sorry? Okay. On the disability point, the argument I think you just mentioned was that he is disabled, so he would potentially fall into the class the state is claiming doesn't need to interview, but didn't receive the waiver and had to interview anyways. Am I understanding that? And so, at the very least, the waiver is being applied inconsistently, and the record shows that. That's correct. That is his relevance to this discussion.  So, because there is not evidence in the record, and the district court never had any opportunity to consider evidence as to the exact parameters of the elderly and disabled waiver, its terms, and who and when it was being applied, the district court did not err in finding that voluntary association applied here, and there's nothing in the record here that would rise to the level of this court needing to disturb that holding. What is your, you heard the conversation a moment ago about the relief that's requested in the complaint, and whether it's, maybe a way to say it is, whether it's like on its face totally out of proportion to the denials, denial of rights or denial of procedure to these individual plaintiffs. Why is that not a problem for the plaintiffs in this case? So, the relief that plaintiffs sought here, again, I want to acknowledge that CASA, Inc. had not come down when much of this litigation happened, so some of the terminology is different, but we do argue that the relief ordered is not overly broad under CASA, Inc., and that it's appropriate because in order to maintain SNAP benefits, plaintiffs have to keep bumping up against this unlawfully run system, and the only way to effectively ensure that that harm does not reoccur as to these specific plaintiffs, is to fix the system. And then additionally, we do also have Empower Missouri, the organizational plaintiff, but if I'm interpreting your question correctly, this is more focused on the individuals. I don't think that, I mean, let's talk about Empower, but I don't think that's true. I mean, I was just like sitting around thinking of narrow relief that could protect these plaintiffs. One could just be these three plaintiffs have suffered an injury in the past, and I enjoin the state to make sure that these people receive benefits in the future and receive their interviews within whatever, 15 days, whatever the district court said as to the universal relief. So I just don't think that's true. I think the district court could have issued a narrow injunction, and I had several other narrower injunctions the district court could have entered. So under CASA, I just don't think that works. So I think the example that was maybe used during the other side's argument was, couldn't they just send an email to make sure these people get their benefits, make sure they get their interviews? And it doesn't practically work in the context of this agency. There's evidence in the record indicating that this agency struggles to do something as simple as indicate in a case file whether someone needs a disability accommodation on an ongoing basis. Their system is, this is not necessarily their fault, but their system is outdated, and it has limited capacity to kind of treat certain people differently than others. And additionally... But why would we assume that the state would violate the injunction that Judge Strass just described, no matter what the failures of the system are? If they've got a Federal court injunction directed at the treatment of these individual plaintiffs, why do we assume that the state either would not or could not abide by it? I don't think it's an assumption. I think it's the record shows that they struggle to treat people differently, even when the law requires it, and that it's not reasonable to expect that they would be able to manage something like this. I think another piece of the way the agency functions that's relevant here is the agency uses what we call in the benefits world task-based processing. I don't want to get too deep into agency functioning here, but individual SNAP recipients in Missouri are not assigned caseworkers. It's not like they can send an email to one particular, you know, Jane Smith, who's in charge of Ms. Holmes' case. It's when Ms. Holmes calls, that call goes to the first available worker. So they don't have structures that are set up to allow for singling particular people out. It would be very unmanageable. But that's what contempt is for, right? I mean, I know you want a broad injunction, but contempt is exactly for that purpose. You issue a narrow injunction. If Missouri doesn't follow it, you hold them in contempt. And there's penalties that come along with that until they comply with the injunction. That's a whole idea behind Trump v. CASA. So I still – we can talk about Empower in a second, but I still don't get – I mean, there's other options as well. For example, you could enjoin the department from denying SNAP benefits for people who have made a reasonable effort at getting the SNAP. I mean, there's just so many narrower injunctions. I know that's not the purpose of the litigation in your view, but I just don't know how we get there under Trump v. CASA. You don't have a class action, and there is a theoretical possibility that – and more than a theoretical possibility that you can get narrow relief for these plaintiffs. So I think where this situation can be distinguished from CASA is CASA involved a – kind of like an up-or-down policy that could be applied to a person or not a person, sort of almost on paper. Here, I think the distinguishing factor here is this, like, constant interaction with the system and the agency's apparent inability to treat people differently within that system. If this Court believes that that's not enough to distinguish from CASA, then certainly the district court could reconsider the relief in light of CASA. The problem is broader than that. You are stating the argument that hasn't been in the law since – I reached a case right after I became a judge that overruled all of the former, oh, let's make a class action out of everything. I – again, I want – And that has persisted to be the rule. And that was the debate in CASA between Justice Barrett and Justice Jackson. Again, I think the fact that the harm here is coming from a broken and unlawful system that these plaintiffs have to consistently and repeatedly interact with makes this different than CASA. No. You're – well, you haven't gone back into the 50 or more years of history when they turned around the Supreme Court's tendency for 20 or 30 years to enjoin everything. And again, I just – I don't know what else I – Particularly institutional injunctions. Institutional reform injunctions. I understand there's been a course correction as to those. I'm just arguing that – It has not gone away, and that was the whole point. And the argument you just stated about two minutes ago was flatly the argument that was rejected by the court 40 years ago. It was almost verbatim what the holdings were in those earlier cases. I – And, you know, people representing clients in your position have been doing that for 40 years. And every couple of – every five or ten years, the court has had to say, wait a minute, that's – we've told you that's not the law. And the district court didn't read those cases. It seems like there's very little I can say to persuade you on this point, so in the interest of time, would it be all right if I moved on? Sure. Okay. So – I'm not taking you back. Empower. I just want to talk about empower real quick. Yes, yes. That was going to be the next place I go. Good, good. Because this doesn't seem like a case – let me ask you this. Let me make it a factual question. Do you – does the organization – not you – does the organization assist people with filling out the applications, preparing for interviews, setting them up with, you know, resources to make sure those interviews happen? Is that, like, a core part of its business? Empower Missouri does not directly assist SNAP recipients in that way. But what Empower Missouri does do is they provide those sorts of – that kind of resources and assistance and guidance to on-the-ground service providers like homeless shelters and food banks. This is through – this is in the record that they convene and organize the Food Security Coalition. This is a – it's a regular meeting and resource group for these sorts of on-the-ground service providers. And they assist those organizations in kind of, like, figuring out how to manage SNAP within their own service populations and how to handle and react to how SNAP is being run in the state. And our argument is that that work, in addition to their advocacy work, was disrupted in such a manner that it reaches the level contemplated in Alliance to constitute injury in effect. See, and I don't think that works because if you were sort of like the get-loud plaintiffs or something like that, where you were actually doing the work for preparing people for interviews and stuff like that, but this falls into the more, like, we're really concerned about this and we need to divert resources to things we ordinarily wouldn't have to divert resources, meaning these other things are falling away. We're just – it's hurting our overall mission. And that is – I think that's the Hippocratic Medicine case. Now, maybe it's a little bit better, but it seems to be the same basic theory, in which case the organizational plaintiff would fall away. I think – I think there is a distinction. Because Empower Missouri is conducting these sorts of – this sort of work regularly, but that work is being disrupted by defendants' conduct, I would point the court to Nairn v. Landry, which is cited in our briefing. It's a post-Alliance Fifth Circuit case. And in Nairn, two racial justice organizations that did voter education and voter kind of encouragement work had their – were found to have injury in fact under Alliance because their work doing voter education and encouraging black voters to vote was disrupted and required diversion of resources to the point that they – But that's why I asked you. The very first question I said, do they advise people on the interview? Do they help them connect them with – and you said no. And so that's not on point then because that's exactly the situation I'm talking about that is not present here. So in Nairn, at least my understanding of the facts of Nairn, is that the plaintiff organizations, they weren't – it wasn't necessarily that they were doing like voter applications. They were encouraging people to vote. They were helping people to vote. And redistricting caused them to change the work that they were doing to meet those same goals. That's what happened to Empower here. They were doing this work. They were helping on-the-ground service providers. And that work was disrupted by defendants' unlawful actions. And it was mostly an economic injury. We had to – I mean, in terms of we had to divert resources to other things because we – or we had to divert resources from other things in order to do this thing we didn't have to do before. It was both financial and staff time. So they diverted money. That's in the record. But they also diverted staff and leadership time in order to cope with the dysfunction and the unlawful conduct at the agency. And, of course, they could have ignored it, right? So the difference between the case you're citing and Get Loud is this was their whole mission. Like, you can't ignore it, right? You can't ignore it. So if it's not – if it's something that we're choosing to do, where we need to – not we need to, but we want to do this because it's serving our core constituency, that's still Alliance for Hippocratic Medicine. I mean, it really is. It is something that is serving their core constituency that they have to do because they're an anti-hunger organization. And SNAP is the biggest anti-hunger program in the country. An organization like Empower Missouri can't sit by and ignore this level of dysfunction in a program that is – its functioning is central to their mission. Or they could decide, I want to do more soup kitchens around Missouri. Like, you have a choice as to where you put your resources. They do have a choice where they put their resources. But, frankly, soup kitchens could never measure up to a well-functioning SNAP program. This is not a place where private charity can make up the difference. And I'm at time. Thank you. Thank you. I'll give you a minute. I mean, you folks could talk about this all day. And we don't have all day, sorry. I just want to address quickly one issue, which was the representation that the Department of Social Services could not handle individually tailored relief. So, in fact, at the temporary – at the TRO hearing, Judge Harpole did ask whether the two parties could agree on a system whereby counsel for plaintiffs could reach out to the department to schedule interviews for the named plaintiffs or for anyone else who came to their notice. That process was set in place. It was further – it's not – it was further changed by the district court, who said that that process should go forward, even if there wasn't a formal attorney-client relationship. That's docket number 50 in the district court. When plaintiffs asked for – filed their motion for remedy, one of the remedies that they asked for was that that process should continue. That's document 164 at page 4. And in response, the defendant stated that it had no plans to dispense with that process and would even set up a dedicated email address. That's docket number 183 at 12. So, there definitely is the ability and has been the ability for the department to have a process for the named plaintiffs or really for anyone else who has come to – who requires special services. Are there no further questions? Thank you. Thank you. The case is very complicated. It's been well-briefed. The argument's been helpful. The court appreciates that, and we'll take it under advisement.